1
2
3
4
5
6
7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11    PROTECTIVE LIFE INSURANCE                No.  2:10-CV-02312-MCE-EFB
      COMPANY,
12
                    Plaintiff,
13                                             **FINDINGS OF FACT AND**
              v.                               **CONCLUSIONS OF LAW**
14
      DONALD GERALD DAVIS, an
15    individual, and RICHARD DOUGLAS
      RISON, an individual,
16
                    Defendant.
17

18          This case was tried before the Court without a jury on February 9-10, 2015, with

19    Defendant Donald Gerald Davis and Defendant Richard Douglas Rison, and their

20    respective attorneys, present.  After considering the pleadings, the evidence, the

21    argument, and briefs from counsel, the Court issues its Findings of Fact and Conclusions

22    of Law.[1]

23    ///

24    ///

25    _____

26          [1] "To the extent that any of the Findings of Facts may be deemed Conclusions of Law, they also
      shall be considered conclusions.  Likewise, to the extent that any of the Conclusions of Law may be
      deemed Findings of Fact, they shall be considered findings."  United States v. Newmont USA Ltd. and
27    Dawn Mining Co., No. CV-05-020-JLQ, 2008 WL 4621566 at *2  n.1 (E.D. Wash. Oct. 17, 2008), citing
      Miller v. Fenton, 474 U.S. 104, 113-14 (1985) (noting the difficulty, at times, of distinguishing findings of
28    facts from conclusions of law).

1

2

**FINDINGS OF FACT**

3   1.    Cynthia J. Rison ("Decedent") was formerly married to William Douglas

4   Rison.  They had two children, a son and a daughter.  Defendant Richard Douglas Rison

5   ("Defendant Rison"), born March 3, 1984, is the son of Decedent and William Douglas

6   Rison.

7   2.    After her separation from William Douglas Rison, Decedent initially had

8   custody of both their children.  However, their daughter later decided to live with her

9   father, and Decedent and William Douglas Rison reached an agreement whereby each

10  would be responsible for one child:  William Douglas Rison would be responsible for their

11  daughter, and Decedent would be responsible for their son, Defendant Rison.

12  3.    As part of her efforts to fulfill this responsibility, Decedent decided to obtain

13  a life insurance policy and name her son as the sole beneficiary.

14  4.    On or around November 15, 2000, Decedent was issued a life insurance

15  policy from Zurich Life Insurance Company ("Zurich"), No. ZL6019205.  The policy had a

16  face amount of $500,000, and the beneficiary was Defendant Rison.  Defendant Rison

17  was sixteen years old when this policy was issued.

18  5.    Decedent married Defendant Donald Gerald Davis ("Defendant Davis") on

19  December 22, 2005.  After their marriage, Decedent began using "Davis" as her last

20  name.

21  6.    On February 15, 2006, Decedent (under the name "Cynthia J. Rison") was

22  issued a life insurance policy by Chase Insurance Life Company ("Chase"), No.

23  ZL9928647 (the "Policy").  The Policy replaced the prior Zurich policy.  The Policy had a

24  face amount of $500,000, and Defendant Davis was the beneficiary.

25  7.    Decedent named Defendant Davis as the beneficiary under the Policy

26  because her son (Defendant Rison) had been incarcerated pursuant to a felony

27  conviction in Idaho, and she was concerned that, if she were to die, the proceeds of the

28  policy would go to the State of Idaho.

2

1    8.    Sometime prior to July 10, 2006, however, Decedent decided to change

2  the beneficiary on the Policy back to her son.  Accordingly, she completed one page of a

3  Chase "Service Request Form," in which she named Defendant Rison as the "100%"

4  beneficiary of the policy.  Chase received this Service Request Form on July 10, 2006.

5    9.    On July 14, 2006, Chase sent a letter to Decedent, advising her of its

6  receipt of the Service Request Form and informing her that Chase was unable to

7  process her request because she had not signed the form as the Policy owner.

8    10.    Decedent apparently never saw this letter as she subsequently told her son

9  and her half-sister, Judy Stiedl, that she believed that the Policy beneficiary had been

10  changed back to her son.

11    11.    Protective Life Insurance Company ("Protective") thereafter acquired

12  Chase and assumed liability under the Policy.

13    12.    In February 2009, Defendant Rison was paroled and came to live with his

14  mother and Defendant Davis.

15    13.    Shortly before his release, Defendant Rison had a conversation with his

16  mother in which she informed him of the existence of the Policy and that he was the

17  beneficiary thereof.

18    14.    In June 2009, Decedent was diagnosed with ovarian cancer.  After having

19  surgery on June 24, 2009, she received various medication, procedures, and treatment

20  that included radiation and chemotherapy.  Though she kept a positive outlook and was

21  determined to fight the cancer, her physical condition declined over the next seven

22  months.

23    15.    Decedent was hospitalized briefly from March 7-9, 2010, at the Mercy San

24  Juan Medical Center in Sacramento after experiencing nausea, vomiting, and pain, and

25  becoming dehydrated for several days.  She was treated for her conditions and

26  discharged.

27    16.    Decedent was hospitalized again from March 20, 2010 to April 5, 2010,

28  complaining again of "[n]ausea, vomiting, and abdominal pain."  At the time of her

1  admission, she was dehydrated, thin, and physically weak.  Again, she was rehydrated

2  and treated for her pain and nausea.  Given her physical condition, and the potential for

3  infection, she was admitted for evaluation and monitoring.

4          17.     Despite her declining physical condition, Decedent was mentally alert, well

5  oriented and did not have any neurologic deficits at the time of her admission on

6  March 20, 2010.

7          18.     After being admitted to the hospital, Decedent called her half-sister, Judy

8  Stiedl, and asked Judy to come be with her.  Defendant Davis also asked Stiedl to come

9  help take care of her sister.  Stiedl, who was then residing in Alaska, flew down as soon

10  as possible.

11          19.     Stiedl arrived at the hospital on March 24, 2010, and she stayed with her

12  half-sister on a nearly "24/7" basis until Decedent was discharged on April 5, 2010.

13          20.     On March 24, 2010, Decedent's physician had informed her and her family

14  that her prognosis was not good and advised her to "get her affairs in order."

15          21.     Later that day, Stiedl asked Decedent whether her affairs were indeed in

16  order.  Decedent stated that she thought they were and mentioned that she had

17  changed the beneficiary on the Policy back to her son "awhile back."  When Stiedl asked

18  Decedent whether she had received confirmation of this change from the insurance

19  company, Decedent stated that she had not and that she "better find out who's on my life

20  insurance."

21          22.     Because Decedent's life insurance information was at her residence in

22  Fiddletown, California, she asked Stiedl to call her son and have him bring it to the

23  hospital.  Accordingly, Defendant Rison brought the box containing his mother's

24  insurance information to the hospital on the morning of March 25, 2010.

25          23.     After receiving these documents, Decedent asked Stiedl to call Protective

26  so that they could determine who the beneficiary was on the Policy.  Stiedl called the

27  number for Protective, and handed the telephone to her sister.  Cynthia identified herself

28  and authorized Stiedl to speak with the Protective representative.  Stiedl then spoke with

4

1    the Protective representative herself and was informed that Defendant Davis was still

2    listed as the policy beneficiary.

3         24.    As the beneficiary had not been changed back to Defendant Rison as

4    Decedent had thought, Stiedl requested that a beneficiary change form be faxed to the

5    hospital.  Protective faxed a two-page Service Request Form to the hospital that

6    morning, and it was provided to Decedent.

7         25.    On the first page of the form, Cynthia Davis directed Stiedl to list Defendant

8    Rison as the "100%" beneficiary of the Policy.  On the second page, Decedent printed

9    her name and then signed and dated it.  She also dictated a cover letter to Protective,

10   which was written by Stiedl.  These three pages were then faxed to Protective.

11        26.    Later that day, Protective sent a letter to Decedent's residence that

12   confirmed the beneficiary on the Policy had been changed to her son, Defendant Rison.

13        27.    On March 31, 2010, Decedent signed the titles to a 2006 Ford F-150 and a

14   2005 Flagstaff trailer over to her son, Defendant Rison.  These vehicles had been

15   purchased before her marriage to Defendant Davis and were titled solely in her name.

16        28.    On April 5, 2010, Decedent was discharged from the hospital, and she

17   returned to her home in Fiddletown, California.

18        29.    On April 11, 2010, Decedent signed the title to a 2005 Ford Escape over to

19   her son.  This vehicle had also been purchased before her marriage to Defendant Davis,

20   and the registered owners were listed as "RISON CYNTHIA J OR DAVIS DONALD."

21        30.    Cynthia Davis was readmitted to the hospital on April 21, 2010, and

22   remained there until she died on April 27, 2010.

23        31.    At the time that Decedent signed the Service Request Form on March 25,

24   2010, she was in full possession of her mental faculties.  Both Stiedl and Defendant

25   Rison found her to be alert, clear, and coherent at the time the Service Request Form

26   was signed.  Hospital records also confirm that on March 25, 2010, both before and after

27   the Service Request Form was signed, Cynthia Davis was "Awake, Alert, Oriented X3,"

28   that she was "Calm," and that her speech was "Clear."  Additionally, in a physical

1    assessment performed by a nurse several hours before the Service Request Form was

2    signed, it was noted that Decedent was feeding herself all meals, and was able to

3    perform all essential hygiene functions such as bathing/showering, shampooing, oral

4    care, catheter care, shaving, and preventative skin care by herself.

5              32.    Though Decedent had executed an Advance Health Care Directive that

6    appointed Stiedl as her agent for making health care decisions, she continued to make

7    her own medical decisions.  In fact, Stiedl did not exercise her authority under the health

8    care directive until the morning of her sister's death on April 27, 2010.

9              33.    Additionally, Decedent's former husband (William Douglas Rison) visited

10   her approximately six times shortly before she died in April 2010.  On these visits, he

11   observed her to be mentally alert, coherent, and in complete possession of her mental

12   faculties.

13             34.    After Decedent's death, both Defendant Rison and Defendant Davis

14   submitted competing claims for the Policy proceeds to Protective.  Unable to determine

15   to whom the Policy proceeds should be paid, Protective deposited those benefits with

16   the Court and filed its Complaint in Interpleader, asking the Court to resolve the dispute.

17   Protective has since been discharged from this action.

18

19                                    **CONCLUSIONS OF LAW**

20

21             1.     Jurisdiction is predicated upon 28 U.S.C. §§ 1332 and 1335.  Jurisdiction

22   and venue were not contested.

23             2.     As the party alleging fraud and deceit, and undue influence, Defendant

24   Davis has the burden of proof to establish his claims.

25             3.     The elements of fraud are:  (1) misrepresentation; (2) knowledge of falsity;

26   (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting

27   damage.  Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003).  In

28   addition, California Civil Code section 1709 explains with regard to deceit that "[o]ne who

                                                     6

1   willfully deceives another with intent to induce him to alter his position to his injury or risk,

2   is liable for any damages which he thereby suffers."  Fraud may also be established by

3   demonstrating nondisclosure or concealment of facts when one is under a duty to

4   disclose such facts.  See Cal. Civ. Code §1710(3); 5 Witkin, Summary of Cal. Law (9th),

5   Torts § 793 (and cases cited therein).

6        4.      Accordingly, to establish a claim for fraud and deceit, Defendant Davis

7   must necessarily prove either that: (1) Defendant Rison made a false representation of

8   an important fact to Decedent, knowing that such representation was false, and

9   intending that such representation be relied upon; or (2) that Defendant Rison

10   intentionally failed to disclose facts to Decedent when he had a duty of disclosure to her.

11   Here, Defendant Davis has shown neither.

12        5.      Defendant Davis asserted that Decedent was concerned about their

13   finances in the Spring of 2009, before her diagnosis of cancer, and that she came up

14   with the following plan: (a) she would change the beneficiary on the Policy to her son

15   (Defendant Rison); (b) if she were to die, Defendant Rison would receive the Policy

16   proceeds and hold them in trust for Defendant Davis while he declared bankruptcy; and

17   (c) once Defendant Davis had completed the bankruptcy process, Defendant Rison

18   would deliver the policy proceeds to him.  Defendant Davis further asserted that

19   Defendant Rison made "false representations and/or false promises to the decedent" in

20   furtherance of this plan, which caused Decedent to change the beneficiary on her life

21   insurance on March 25, 2010.

22        6.      These assertions, however, were unsupported by the facts.  Defendant

23   Davis did not discuss Decedent's purported plan with Defendant Rison or with anyone

24   else prior to March 25, 2010.  Nor did Defendant Davis ever hear Decedent discuss this

25   plan with anyone else.  Moreover, there was no evidence that Defendant Rison was

26   aware of the alleged plan or that he ever discussed it with Decedent.  There was likewise

27   no evidence that Defendant Rison—or anyone else—made any statements to Decedent,

28   or took any actions, to induce her to change the beneficiary on the Policy.  In fact, the

1  only conversation that Decedent had with Defendant Rison about the Policy was the one

2  in which she informed him of the existence of the Policy and told him the he was the

3  beneficiary thereof.

4       7.     Accordingly, Defendant Davis has not met his burden of proof to establish

5  fraud and deceit, as he has failed to provide any evidence that: (1) Defendant Rison

6  made a false representation of an important fact to Decedent, knowing that such

7  representation was false, and intending that such representation be relied upon,

8  Manderville v. PCG&S Group, Inc., 146 Cal. App. 4th 1486, 1498 n.4 (2007); or

9  (2) Defendant Rison intentionally failed to disclose facts to Decedent when he had a duty

10  to do so.  Cal. Civ. Code § 1710(3).

11       8.     Defendant Davis's claim of undue influence fails for similar reasons.  As it

12  pertains to contracts, undue influence is defined by statute as consisting: "(1) In the use,

13  by one in whom a confidence is reposed by another, or who holds a real or apparent

14  authority over him, of such confidence or authority for the purpose of obtaining an unfair

15  advantage over him; (2) In taking an unfair advantage of another's weakness of mind; or,

16  (3) In taking a grossly oppressive and unfair advantage of another's necessities or

17  distress."  Cal. Civ. Code § 1575.  Undue influence "means excessive persuasion that

18  causes another person to act or refrain from acting by overcoming that person's free will

19  and results in inequity."  Cal. Prob. Code § 86; Cal. Welf. & Inst. Code § 15610.70(a).  In

20  evaluating undue influence, courts shall consider: (1) the vulnerability of the victim;

21  (2) the influencer's apparent authority; (3) the actions or tactics used by the influencer;

22  and (4) the equity of the result.  Id.  "Although a person challenging the testamentary

23  instrument ordinarily bears the burden of proving undue influence . . . , this court and the

24  Courts of Appeal have held that a presumption of undue influence, shifting the burden of

25  proof, arises upon the challenger's showing that (1) the person alleged to have exerted

26  undue influence had a confidential relationship with the testator; (2) the person actively

27  participated in procuring the instrument's preparation or execution; and (3) the person

28  ///

8

1  would benefit unduly by the testamentary instrument." <u>Rice v. Clark</u>, 28 Cal. 4th 89,

2  96-97 (2002).

3      9.    Here, there is no evidence of any undue pressure, persuasion, argument,

4  entreaty, or any coercive acts that resulted in Decedent executing the Service Request

5  Form on March 25, 2010.  As noted above, there is no evidence that Defendant Rison,

6  or anyone else, made any statements to Decedent, or took any actions, to induce her to

7  change the beneficiary on the Policy.  To the contrary, it is clear that Decedent intended

8  that the beneficiary of the Policy be her son.  She first obtained a life insurance policy in

9  2000, and named her son as the beneficiary.  Though she temporarily named Defendant

10  Davis as the beneficiary of the Policy on February 15, 2006, she clearly intended to

11  change it back to her son as early as July 2006 when she submitted one page of a

12  Service Request Form to Chase.  Indeed, she appears to have thought the Policy had, in

13  fact, been changed back to her son, as evidenced by the conversation with Defendant

14  Rison before his release from prison and the conversation with Stiedl, on March 24,

15  2010, wherein she stated that she had changed the beneficiary back to her son "awhile

16  back."  When Decedent found out that the beneficiary on the Policy was not her son,

17  she, with her Stiedl's assistance, completed and signed another Service Request Form,

18  and had it faxed to Protective.

19      10.    The facts make clear that Defendant Rison did not actively participate in

20  the preparation or the execution of the document.  Decedent directed the completion of

21  the Service Request Form and signed it without any participation by Defendant Rison.

22  Furthermore, Defendant Rison and Stiedl did not have any discussion between them

23  regarding the Policy or the beneficiary thereof prior to the execution of the Service

24  Request Form on March 25, 2010.  Defendant Rison's only involvement in the process

25  was to bring the "little box" containing his mother's insurance information to her at the

26  hospital—which he did pursuant to Decedent's request.

27      11.    Additionally, there was no "undue benefit" conferred upon Defendant Rison

28  as a result of the beneficiary change.  As noted above, Decedent intended for him to be

9

1    the beneficiary of the Policy.  The person most involved in this process (besides

2    Decedent) was Stiedl, who did not profit or receive any benefit from the change in

3    beneficiaries.

4            12.     Some cases have suggested that undue influence must be established by

5    a strong showing—even by clear and convincing evidence.  <u>Estate of Ventura</u>,

6    217 Cal. App. 2d 50, 58, 31 Cal. Rptr. 490 (1963).  However, as there is not even a

7    preponderance of evidence of undue influence in this case, the Court does not need to

8    resolve this issue.

9            13.     The Court is aware that Defendant Davis relies heavily on his contention

10    that Decedent's capacity was diminished by medications and chemotherapy, leaving her

11    confused and incoherent, to show that Decedent was particularly susceptible to undue

12    influence.  That argument is moot based on the Court's above conclusion that there no

13    attempt was made to influence Decedent in the first place.  However, it is unclear

14    whether Defendant Davis also intends to argue more generally that Decedent lacked the

15    requisite legal capacity to change the beneficiary on the life insurance contract.  To the

16    extent Defendant Davis makes this argument, the Court disagrees.

17            14.     There is "a rebuttable presumption affecting the burden of proof that all

18    persons have the capacity to make decisions and to be responsible for their acts or

19    decisions."  Cal. Prob. Code § 810(a); <u>see also</u> Cal. Prob. Code § 6100; <u>Estate of</u>

20    <u>Markham</u>, 46 Cal. App. 2d 307, 314.  "It is difficult to formulate any rule determining the

21    degree of mental weakness which will destroy a person's capacity to convey property . . .

22    [M]ental competency requires that the mind and memory of the grantor be sufficiently

23    sound to enable him to know and understand the business in which he was engaged at

24    the time he executed the deed."  <u>Hughes v. Grandy</u>, 78 Cal. App. 2d 555, 564 (1947)

25    (internal citations and quotations omitted).  "Old age alone does not render a person

26    incompetent to execute a deed.  Nor will sickness, extreme distress or debility of body

27    affect the capacity of the grantor to make a conveyance if sufficient intelligence

28    remains."  <u>Id.</u> (internal citations and quotations omitted).

15.     When a trust or other contractual agreement is in essence a testamentary document, as in this case, courts have increasingly applied the testamentary standard of capacity set forth in Section 6100.5 of the California Probate Code.  Furthermore, "[t]he rules governing capacity to execute a deed are in general the same as those governing testamentary capacity."  Tuttle v. Bessey, 137 Cal. App. 2d 725, 727 (1955).  "An individual 18 or more years of age who is of sound mind" may make a valid will under California law.  Cal. Prob. Code § 6100(a).  A person is not mentally competent to make a will  if at the time the will is executed, either of the following is true:

> (1)     The individual does not have sufficient mental capacity to be able to (A) understand the nature of the testamentary act, (B) understand and recollect the nature and situation of the individual's property, or (C) remember and understand the individual's relations to living descendants, spouse, and parents, and those whose interests are affected by the will.

> (2)     The individual suffers from a mental disorder with symptoms including delusions or hallucinations, which delusions or hallucinations result in the individual's devising property in a way which, except for the existence of the delusions or hallucinations, the individual would not have done.

Cal. Prob. Code § 6100.5(a).

16.     A person challenging capacity must show that a lack of capacity existed at the moment when the document was signed.  Estate of Fritschi, 60 Cal. 2d 367, 372 (1963).  "Evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversation, both before and after the execution of the will, are admissible so long as they have a reasonable tendency to indicate his mental condition at the time of the execution of the will."  Estate of Miller, 16 Cal. App. 2d 154, 165 (1936).  The foregoing legal principles are largely undisputed.  It is the application of the law to the facts that divides the parties.

17.     Defendant Davis testified that from March 20, 2010 to April 5, 2010, he visited Decedent every day while she was in the hospital, that she was confused every time he visited her, that she could not understand the things that he would say to her,

1  and that her mental state declined during this period.  Defendant Davis further testified

2  that Decedent 's mental faculties did not improve before she died.

3        18.    His testimony regarding Decedent's mental capacity, however, was

4  contradicted by her medical records and the testimony of Defendant Rison, Stiedl, and

5  William Douglas Rison, all of whom confirmed that Decedent was mentally alert and in

6  full possession of her mental faculties until the last day of her life, April 27, 2010.

7  Further, Decedent continued to make her own medical decisions until April 27, 2010.

8  The weight of the evidence clearly establishes, and indeed leaves the Court with no

9  doubt, that Decedent had the legal capacity to execute the Service Request Form on

10  March 25, 2010, and that her capacity was not diminished at any time during the

11  relevant period such that she would have been susceptible to any undue influence.

12        19.    Defendant Davis's credibility on this issue is further impacted by his

13  admission that his own mental faculties were somewhat compromised during the

14  relevant time period.  Defendant Davis was diagnosed with colon cancer in August 2009,

15  and began radiation and chemotherapy shortly thereafter.  He had surgery in January

16  2010, and then started a five to six-month course of chemotherapy in February 2010.

17  While he was receiving chemotherapy, Defendant Davis admits the treatment affected

18  his memory and caused him to misunderstand the things that people told him.  This

19  admission, and Defendant's apparent confusion at times on the stand, affected the

20  credibility of his own testimony.  The Court recognizes that Defendant Davis offered this

21  evidence to show that the as a result of the chemotherapy Decedent received, she also

22  must have experienced memory problems and misunderstood things during the relevant

23  time period.  However, there is no evidence before the Court, other than Defendant

24  Davis's unsupported statements, that the cancer treatments had the same effect on

25  Decedent as they had on him.  To the contrary, as indicated, the bulk of the evidence

26  supports the conclusion that Decedent was completely capable of making her own

27  decisions.

28  ///

20.     Finally, Defendant Davis claimed that the transfers of the 2006 Ford F-150, 2005 Flagstaff trailer, and 2005 Ford Escape were evidence of a conspiracy between Defendant Rison and Stiedl to "steal everything" he owned, which included the Policy proceeds.  In essence, Defendant Davis was attempting to use these transfers to support and prove his claims of fraud and deceit, and undue influence, against Defendant Rison.  However, Defendant Davis did not provide any evidence of any conspiracy between Defendant Rison and Stiedl to "steal" anything from him.  The transfers themselves were not evidence of a conspiracy.  Nor was there any evidence that these transfers were the products of fraud and deceit, or undue influence. Decedent, as a registered owner of each of these vehicles, had the legal right to transfer them to whomever she desired, and she chose to transfer them to her son, Defendant Rison.  Further, as already determined, Decedent had the legal capacity to make such transfers at all times during the period when the vehicles were transferred.  In sum, the vehicle transfers do not serve to show that Decedent's decision to change the beneficiary on her life insurance policy was the result of either fraud or undue influence.

///
///
///
///
///
///
///
///
///
///
///
///
///

13

1

**CONCLUSION**

2

3          The Court, having considered all materials in the record and having presided over

4     the bench trial in this matter, hereby orders that judgment be entered in favor of

5     Defendant Richard Douglas Rison.  The Clerk of the Court is directed to disperse to

6     Defendant Richard Douglas Rison all remaining funds deposited into the Registry of this

7     Court by Protective Life Insurance Company with regard to this matter and to close this

8     case.

9          IT IS SO ORDERED.

10    Dated:  May 26, 2015

11

12

13    _____
      MORRISON C. ENGLAND, JR., CHIEF JUDGE

14    UNITED STATES DISTRICT COURT

15

16

17

18

19

20

21

22

23

24

25

26

27

28